In re J.W. WESTCOTT CO.

No. 01–CV–74359.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 31, 2002.

Thomas P. Branigan, Bowman & Brooke, Troy, Steven B. Belgrade, George M. Velcich, Belgrade & O'Donnell, Chicago, IL, for J.W. Westcott Co.

Philip G. Meyer, Farmington Hills, MI, for Great Lakes Pilotage Authority.

Henry E. Billingsley, II, Jeffrey A. Healey, Arte & Hadden, Cleveland, OH, for Knutsen Produkt Tanker V AS, Vessel Sidsel Knutsen and Robert Hull.

Dennis M. O'Bryan, O'Bryan, Baun, Birmingham, MI, for Gary Natsiaka, and Katherine Natsiaka.

**ORDER DENYING CLAIMANTS' "MOTION FOR SUMMARY JUDGMENT AGAINST ROBERT HULL" AND DENYING J.W. WESTCOTT COMPANY'S "MOTION FOR SUMMARY JUDGMENT AGAINST ROBERT HULL"**

CLELAND, District Judge.

Pending before the court is Claimants' "Motion for Summary Judgment Against Robert Hull," filed on October 31, 2002. Petitioner J.W. Westcott Company also

filed a "Motion for Summary Judgment Against Robert Hull," on November 12, 2002, in which Petitioner expresses its desire to "[join] in Claimants' motion for summary judgment against HULL." (Pl.'s Mot. at 2.)[1] After reviewing the briefs, the court concludes that a hearing on the motions is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons set forth below, the motion will be denied.

## I. BACKGROUND

This case involves the October 23, 2001 capsizing and sinking of the J.W. WESTCOTT II ("WESTCOTT"), in which two crew members of the WESTCOTT were killed. The WESTCOTT is a vessel that delivers mail, packages, and pilots to commercial vessels on the Detroit River. The WESTCOTT was allegedly approaching the M/V SIDSEL KNUTSEN ("KNUTSEN"), a Norwegian gasoline tanker, when the relevant events occurred. Although the facts surrounding the tragedy are heavily disputed, the captain of the KNUTSEN, Robert Hull, testified to the following during his deposition:

Captain Hull, a Canadian registered pilot, was on the KNUTSEN's bridge[2] when it passed the Detroit River Light on October 23, 2001. The Detroit River Light is just south of the entrance to the Detroit River, a restricted waterway through which a vessel such as the KNUTSEN cannot travel without a United States or Canadian registered pilot. As the KNUTSEN proceeded up the Detroit River, Captain Hull planned on placing his already-packed bag outside of his room sometime prior to the pilot exchange that was to take place on the River when the WESTCOTT was to deliver a relief pilot to the KNUTSEN. The intent of this was to have Captain Hull's belongings ready prior to the pilot exchange and to allow another crew member to retrieve the bag and have it on the deck when Captain Hull was ready to disembark.

Prior to Captain Hull leaving the bridge, another captain, Jan Holthe stood up and accepted the con[3] of the ship. Captain Hull told Captain Holthe to "[b]ear on course .... My intent is to go down. Should I not come back, the next course when you're under the power lines is to head up in the first abutment of the [Ambassador] [B]ridge." (Hull Dep. at 201.) The KNUTSEN was two miles downriver from the WESTCOTT's pilot station, the location of the J.W. Westcott Company's office, and traveling at a rate of 8.8 to 9.2 knots when Captain Hull left the bridge.

Captain Hull retrieved his bag on the third superstructure deck, which was one level below the bridge. He was away from the bridge for approximately 90 seconds. When Captain Hall returned to the bridge, he heard someone on the walkie-talkie say that the pilot boat had flipped. Captain Holthe called for Captain Hull and they both proceeded to the port side of the bridge and looked down into the water where they saw the capsized WESTCOTT.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to

1. Petitioner's motion contains no analysis, but merely sets forth the position taken in Claimants' motion. Thus, Petitioner's motion for summary judgment rests on the same ground as Claimants'.

2. The bridge is the platform above the deck of the ship.

3. Captain Hull's response states, "Transferring 'the con' in this case involved Captain Hull obtaining the acknowledgement [sic] of Captain Holthe that he was aware that Captain Hull was momentarily leaving the bridge and that, during his absence the vessel should continue to maintain her course and speed." (Resp. at 7 n.5.)

judgment as a matter of law. Fed. R. Civ. Pro. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

### III. DISCUSSION

Claimants argue that Captain Hull violated a federal statute by leaving the bridge and that this violation constitutes negligence per se. Defendants rely on the "Pennsylvania doctrine." In *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), the Supreme Court ruled:

> [W]hen ... a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*Id.* at 136; *see also Algoma Central Corp. v. Michigan Limestone Operations,* No.

94–1917, 1996 WL 23214 (6th Cir. Jan.22, 1996). Thus, to shift the burden of proof on the issue of causation to Captain Hull, the Claimants must prove that Captain Hull violated a statute or regulation that was enacted to prevent marine accidents.

Claimants allege that Captain Hull violated the Great Lakes Pilotage Act of 1960 ("GLPA"), 46 U.S.C. § 9302(a)(1)(A), which states, in relevant part, that "each foreign vessel shall engage a United States or Canadian registered pilot for the route being navigated who shall ... in waters of the Great Lakes designated by the President, direct the navigation of the vessel subject to the customary authority of the master." *Id.* On December 22, 1960, President Dwight D. Eisenhower designated the Detroit River, along with other bodies of water, as District 2, which means that the GLPA applies to the Detroit River. Further, the statute was apparently enacted to ensure safety on the Great Lakes. *See* H.R.Rep. No. 86–1666 (1960) U.S. Code Cong. & Admin. News at 2481, 2483 ("In view of the large increase in the volume of ocean shipping entering the great lakes as a result of the opening of the St. Lawrence Seaway, establishment of such requirements has become essential in the interest of maritime safety."). Thus, if Captain Hull violated the GLPA, the burden of proof on causation would shift to Captain Hull.

The GLPA states that the registered pilot "shall ... direct the navigation of the vessel" in designated waters. 46 U.S.C. § 9302(a)(1)(A). Claimants argue that Captain Hull violated this statute when he left the bridge for approximately 90 seconds because he stopped directing the navigation of the KNUTSEN. Claimants cite no case law to guide this court in determining when a pilot fails to "direct the navigation of the vessel." [4] *Id.* Further,

---

4. Federal interpretation of 46 U.S.C. § 9302

is indeed sparse. The court could locate only

the legislative history does not indicate what is specifically required of the pilot in discharging the duty of "directing the navigation of the vessel."[5] Finally, the term "direct the navigation of the vessel," does not appear to be a term of art in admiralty law or in the shipping industry.

Although there is little guidance as to what Congress had in mind when it drafted and enacted the phrase, "direct the navigation of the vessel," the court finds that, based on the evidence submitted, summary judgment should not be entered against Captain Hull. According to his testimony, Captain Hull momentarily absented himself from the bridge, was gone for only 90 seconds, and instructed another captain to maintain the current course of navigation during the his brief absence. *See Halverson v. Slater,* 129 F.3d 180, 182 (D.C.Cir.1997) ("Among other things, GLPA required commercial ships to employ a registered United States or Canadian pilot to steer them (*or advise them how to steer* ) safely and efficiently through certain portions of the Great Lakes, their tributaries and outlets, and the approaches to the Sault Sainte Marie Locks.") (emphasis added). If Congress intended to impose a duty upon pilots in which the pilot was required to never cease steering the vessel, Congress could have used more direct and detailed language. Congress, however, used the phrase, "direct the navigation of the vessel." This phrase does not imply that a pilot must remain at the helm during a vessel's entire trip through designated waters, and Claimants have not provided any support for their proposition that a pilot is no longer "directing the navigation" of a vessel when he instructs another crew member on the proper speed and course of the vessel while the pilot momentarily steps away from the bridge. *See* American Heritage Dictionary, 200 (2d ed.1983) (defining the verb "direct" as "[t]o conduct the affairs of; manage"). In fact, Claimants position is untenable when one considers the common inconveniences and needs that arise on long voyages away from land, often drawing the pilot momentarily away from the helm of the vessel.[6]

In this case, Captain Hull admits to leaving the bridge of the ship while it was progressing up the Detroit River. Nonetheless, he did not fail to direct the navigation of the KNUTSEN during his brief absence. He instructed another captain on the proper course of the ship, and was only one level below the bridge for under two minutes. Based on these facts, the court finds that summary judgment against Captain Hull is unwarranted.

four references to the statute in all federal case law since the statute's 1960 enactment. These cases do not analyze the meaning of the provision at issue in this case. Further, Claimant's reliance on *Crowley American Transport, Inc. v. Double Eagle Marine, Inc.,* 208 F.Supp.2d 1250 (S.D.Ala.2002), is misplaced. *Crowley* did not involve § 9302 and was simply a finding of negligence after a bench trial. Thus, it provides little guidance in the court's task of determining if Captain Hull violated the GLPA.

5. The legislative history states:

Consideration was also given to the circumstances that a much greater degree of specialized local knowledge and experience is required for the safe navigation of the con-

fined waters of the Great Lakes than is necessary for the open waters of the lakes. Consequently, provision is made for the use of registered pilots by all ocean vessels while navigating the designated confined waters.

H.R.Rep. No. 86–1666 (1960), U.S. Code Cong. & Admin. News at at 2484. No description or definition of the pilot's precise duties could be found in the legislative history.

6. For instance, Captain Hull testified that he did not plan on remaining on the bridge while in restricted waters because he might have "things to do." (Hull Dep. at 159.) "Potentially [he] might have to urinate. [He] might have to go to the toilet." (*Id.*)

Thus, Claimants have not shown that Captain Hull was per se negligent under the Pennsylvania doctrine.

## IV. CONCLUSION

IT IS ORDERED that Claimants' "Motion for Summary Judgment Against Robert Hull" [Dkt. # 67] and Petitioner J.W. Westcott Company's "Motion for Summary Judgment Against Robert Hull" [Dkt. # 69] are DENIED.